Clyde E. CLAPPER, Plaintiff-Appellee,

v.

ORIGINAL TRACTOR CAB COMPANY, Inc. and Stanley Williams, Defendants-Appellants.

Clyde E. CLAPPER, Plaintiff-Appellant,

v.

ORIGINAL TRACTOR CAB COMPANY, Inc. and Stanley Williams, Defendants-Appellees.

Nos. 12470, 12471.

United States Court of Appeals Seventh Circuit.

Sept. 30, 1959.

KNOCH, Circuit Judge.

This action was originally brought April 14, 1950, by Clyde E. Clapper and Lee Flora for infringement of Clapper Patent No. 2,452,834 (Hot Air Deflector for Tractors) and Flora Patent No. 2,461,974 (Enclosure for Tractors). The original defendants, The Original Tractor Cab Company (hereinafter called "Original") and Stanley Williams (its president and a director) joined licensees of Clapper and Flora as cross-defendants.[1] Original and Williams counterclaimed for misuse of patents and violation of the antitrust laws.

By settlement in December 1954, Flora dismissed his claim for patent infringement and defendants agreed not to proceed against him or the cross-defendants under the counterclaim.

Clapper then filed an amended complaint setting up five causes of action, three of which Clapper allowed to be dismissed. Only one seems to be pursued in this Court: the claim of patent infringement.

The District Court found the Clapper patent invalid, dismissed the claim for unfair competition, found no breach of contract by defendants, held that the settlement of December 1954 did not discharge Clapper from liability under the counterclaim and awarded defendants attorneys' fees incurred in connection with both the patent and the antitrust phases of the case, as well as damages for antitrust violation.

Clapper, appealed, relying on the following alleged errors in the Trial Court's rulings and judgment:

"(1) Exclusion of Plaintiff's Exhibits 199 and 200 relating to the settlement of Dec. 14, 1954.

"(2) Denying Plaintiff's Motion to Dismiss Defendants' Counterclaim since such cross action should have been released and dis-

Thomas E. Scofield, Kansas City, Mo., Claude W. Lowe, Kansas City, Mo., for plaintiff-appellant Clapper.

J. Preston Swecker, Washington, D. C., Kenneth L. Earnest, Rushville, Ind., Swecker & Mathis, Washington, D. C., of counsel, for Original Tractor Cab Co.

Before SCHNACKENBERG, PARKINSON and KNOCH, Circuit Judges.

---

1. Comfort Equipment Co. v. Steckler, 7 Cir., 1954, 212 F.2d 371. Two of the licensees moved to dismiss Original's counterclaim and cross-complaint on the ground that proper venue did not exist. The Trial Court overruled the motions, whereupon the two licensees sought writs of mandamus, which this Court denied.

missed by the settlement of Dec. 14, 1954.

"(3) Adjudicating the Clapper patent invalid.

"(4) Awarding defendants attorneys' fees for prosecution of the patent defense phase of the case based upon its being an exceptional case.

"(5) Denying Plaintiff's Motion under Rule 37(b)(2), F.R.Civ.P. [28 U.S.C.A.], to discipline and penalize defendants for failure to comply with the Court's orders with respect to the production of documents and discovery under Rule 34.

"(6) Awarding defendants damage under their counterclaim for antitrust violation when no damage was proved which was the proximate cause of any alleged violation.

"(7) Making a separate award of attorneys' fees to defendants for prosecution of the antitrust phase of the case when no damage was proved which was the proximate cause of the alleged violation.

"(8) Refusing to consider defendant Williams' breach of the contract made with plaintiff Clapper.

"(9) Awarding Defendants costs in the case."

Defendants assert that the District Court erred in failing to include attorneys' fees, awarded for defense of the patent infringement action, as a part of the compensatory damages to be trebled under section 4 of the Clayton Act, 15 U.S.C.A. § 15. They argue that the patent infringement action was filed as part of the conspiracy in violation of the antitrust laws. They contend further that the District Court erred in failing to include damages for loss of potential sales and in awarding attorneys' fees at less than a sum proportionate to the skill and time involved. Their position is that the cause should be remanded with directions to recompute fees and damages in accordance with the foregoing.

A brief reference to the history of this litigation is appropriate here. On March 17, 1945, Clapper applied for Letters Patent, and in May, 1945, gave an exclusive license to Bearing Distributors (later Comfort Equipment Co., and hereinafter called "Comfort"). In 1948 the U. S. Patent Office declared two interferences involving applications of Flora and one Halligan.

Flora had licensed Cab-Ette Co. (hereinafter called "Cab-Ette") and Halligan had licensed the Fort Dodge Tent and Awning Co. (later Burch Manufacturing Co., hereinafter called "Burch").

In April, 1948, Clapper, Flora, Halligan and their licensees and attorneys met to settle the interferences. The result of their efforts was the License Agreement of August 3–4, 1948, whereby Flora and Clapper jointly licensed Comfort, Burch and Cab-Ette.

In the summer of 1948, Original began manufacture of the accused device. On November 24, 1948, Clapper sent Original notice of infringement of his patent. In August, 1949, Clapper's attorney sent a second notice to Original and sent notices of infringement to Original's distributors threatening suits for patent infringement. This suit was instituted April 14, 1950, as indicated.

The group license was terminated by agreement April 6, 1953, (effective November 15, 1952) during the pendency of a civil suit brought, about a year after the initial patent infringement suit, by the Department of Justice, in the Western District of Missouri, against Flora, Clapper, and their licensees, for antitrust violation. That action was terminated by consent decree dated October 27, 1953. The District Court found *inter alia:*

"59. By the Agreement of August 3–4, 1948, the patentees, Clapper and Flora, granted a non-exclusive and non-transferable license to Comfort, Cabette and Burch to manufacture and sell tractor covers. The limitations imposed on the licensees by said Agreement, that the licensees would manufacture the inventions 'at their respective  *  *  named addresses and in no other

place or places'; and that no other license would be granted 'without obtaining the written consent thereto of the remaining parties to the Agreement;' that if a license so granted was terminated, as provided in Paragraph 8 thereof Flora or Clapper, respectively, shall be at liberty to license other licensees; that the parties would 'mutually agree upon procedure for the disposition' of infringement suits; and that the parties set up a 'litigation fund' to be used for that purpose, all are elements of illegality when used for an illegal purpose, as they were."

It is apparently conceded that the joint License Agreement violated sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2.

After the consent decree in the Missouri case, a license was twice offered to Original and twice declined by Original, which was then contesting the validity of the patents in this cause, although prior to suit, Original had sought a license from plaintiffs.

The group License Agreement had provided for a litigation fund, of which Clapper was trustee. He directed the policing of the licensed patents. When the License Agreement terminated, the litigation fund, out of which costs of this suit had been paid, was divided between Clapper and Flora to maintain this action which was then still pending.

Clapper moved for admission of exhibits 199 and 200 as pertinent to the then pending questions of attorneys' fees, possible release of Clapper from liability under the counterclaim for antitrust violation, and Clapper's assertion that defendants had not complied fully with the District Court's order requiring production of documents. Exhibit 199 was described in the aforesaid motion as a conformed copy of the Agreement dated December 14, 1954, executed by Flora, Cab-Ette, Comfort and Burch (the three licensees) and four attorneys for defendants. Exhibit 200 was described as a conformed copy of waiver and release of attorneys' lien executed by the same four

attorneys. Both documents are set out in plaintiff's appendix at pages PA–431 to 435.

The District Court found that nothing would be gained from admission of these documents and overruled the motion. However, the District Court plainly indicated that full consideration had been given to the contents of these documents, remarking that the Court stood on its prior ruling that Clapper had not been released by the terms of the settlement and covenant not to sue the other alleged joint tort-feasors. The District Court went on to say that the waiver and release of attorneys' lien meant only that the attorneys would not look to Flora, Comfort, Burch, and Cab-Ette for payment of fees. The defendants were not parties to the release and were not thus precluded from recovering fees and costs as provided by the antitrust laws. The District Court also found that defendants had made satisfactory production. We cannot agree with plaintiff that denial of admission of these exhibits constituted error on the part of the Trial Court.

Clapper concedes that the settlement with Flora and the three licensees purported to be a mere covenant not to sue and expressly reserved any rights existing against Clapper. One of the provisions allows the covenant not to sue to be pleaded as a defense in any action taken in breach of that covenant. Clapper argues that this renders the agreement, in effect, a legal release. He cites Indiana Statutes and cases in support of the principles that release of a plurality of joint tort-feasors releases and discharges all the joint tort-feasors and that actions for violation of the Sherman Act sound in tort.

Clapper relies principally on three cases to support his theory that a "covenant not to sue" is in effect a "release" if it may be pleaded as a defense to defeat the action brought by the covenantor. In Haney v. Cheatham, Supreme Court of Washington, 1941, 8 Wash.2d 310, 111 P.2d 1003, 1006, the Court said that the consideration for the covenant not to sue "reasonably compensated the

releasor for the entire damage sustained." In Byrd v. Crowder, 1933, 166 Tenn. 215, 60 S.W.2d 171, the Court refers to rulings to the contrary in Massachusetts and Minnesota with the comment that in those courts, a mere covenant not to sue may be pleaded in defense of an action brought in breach of the covenant. (Burns, Indiana Statutes, Vol. 2, Sec. 2–1015 and Rule 12, Federal Rules of Civil Procedure, permit pleading all affirmative defenses, legal and equitable.) The Court noted many conflicting decisions collected in notes in 50 A.L.R. 1081 and 66 A.L.R. 212, but concluded it is "unprofitable to do more than refer to those authorities. Our own cases clearly direct our course on the question before us." The Court also said of the covenant before it that a covenant not to sue is not a satisfaction of the claim for damages, and hence may be pleaded in the Tennessee Court only "by way of set-off or recoupment." Thus the Court in the Byrd case found an inconsistency in the provision that the covenant "may be pleaded as a defense to any action. * * *" In Pellett v. Sonotone Corp., 1945, 26 Cal.2d 705, 160 P.2d 783, 787, California Supreme Court the Court, in construing an agreement not to be a release, said:

"The theory on which a release is held to bar a recovery is that plaintiff has accepted payment in satisfaction or in compromise of his right of action, and has released and abandoned his right of action in consideration of the payment received. In the present case there is nothing in the agreement, or in the record, to indicate that the payments * * * were intended to or did constitute any payment in satisfaction, * * * or in compromise, of the right of action."

These three cases are thus not inconsistent with the Indiana cases cited by defendants. The controlling factor is the intention of the parties. A pertinent question is: has full satisfaction been obtained by the injured party?

In Cleveland, C., C. & St. L. R. Co. v. Hilligoss, 1908, 171 Ind. 417, 86 N.E. 485, the Court stressed the fact that for a single injury there could be but one recompense and that one cannot have more than one satisfaction. The Court then said 171 Ind. at pages 423–424, 86 N.E. at page 488:

"* * * a contract, which purports to be a satisfaction and release of a wrongdoer jointly liable with others, * * * must clearly show that the injured party for a consideration, has surrendered * * * all claim for recompense for and on account of the trespass complained of. If it does so appear, there can be no further proceeding, for the right of action for the wrong is forever gone. (Citing cases)"

The Indiana court then went on to say that, in that case, the fact that plaintiff accepted the consideration in satisfaction was incontrovertible.

In Parry Mfg. Co. v. Crull, 1913, 56 Ind.App. 77, 101 N.E. 756 (case 2) the Court found from the terms of the agreement that plaintiff had not intended to accept it as full satisfaction of his claim for damages, and held that the amount paid was only a partial satisfaction *pro tanto* to the others jointly liable who were not relieved as to the residue of the damages.

In Brown v. Kemp, 1919, 71 Ind.App. 281, 124 N.E. 777, 778, the agreement stated that the consideration had been "received to my full satisfaction."

In Bedwell v. DeBolt, 1943, 221 Ind. 600, 50 N.E.2d 875, the Court held that joint tort-feasors are discharged by the unqualified release of one and that full satisfaction of one operates to discharge all. The Court went on to note that a covenant not to sue one tort-feasor did not bar action against the others, but operated only as a satisfaction of damages *pro tanto* as to benefits received.

The District Court, in the case before us, found that the agreements were mere covenants not to sue, which expressly set out that the amount received was not received in full satisfaction and that the

claim against Clapper was expressly not released.

■ Clapper also contends that making these covenants binding on successors, assigns, heirs, administrators, and executors, indicates that they were in reality releases because such words have no place in a personal covenant not to sue. He cites Jenkins v. Southern Pac. Co., D.C.1937, 17 F.Supp. 820, 827 in support of his contention. In that case the Court did say that such words had no place in a personal covenant not to sue, but did not rely on that one factor alone. The Court observed that the form used followed the exact terminology used in California in the preparation of releases except that an effort had been made not to use the word "release." The facts of the case explain the holding and distinguish Jenkins from the case before us. Jenkins was a passenger conductor of the Southern Pacific Company, who was fatally injured while ejecting a drunken, violent passenger, Kash. Jenkins' widow, for herself as executrix and for her minor son, brought action against Kash, the Southern Pacific Railroad, the Pullman Company, Hatch (the Pullman conductor who had called on Jenkins for help with the disorderly passenger), Myers (a porter) and Dolsen (a gateman), all of whom allegedly had allowed the assault to be committed by their acts or by their failure to act. Two causes of action were pleaded; one against all defendants and one against Kash alone. After issue was joined and the case set for trial, the cause was dismissed as to the Southern Pacific and Dolsen. The remaining defendants filed supplemental answers alleging release of all claims arising out of the matters set forth in the Complaint. The "covenant not to sue" had been confirmed by the California probate court in the Matter of the Estate of Robert L. Jenkins and an order had been entered permitting Jenkins' widow, as executrix, to dismiss the action as to Southern Pacific Co. The Court held that although the theory of liability differed, the same cause of action was alleged against all defendants. The Court stated the principle that to re-

lease all others, the release to some tortfeasors must be made with the understanding that it is given in full satisfaction. The Court cited cases to the effect that a mere covenant not to sue, which does not contain words amounting to a release of the cause of action, or which negatives such release, is not effective for the purpose of releasing other joint tortfeasors. The California Court further said that mere dismissal of some defendants would not ordinarily release the others. "The line of demarcation," the Court continued, "is sometimes very thin," and proceeded to analyze not only the "covenant not to sue," but the proceedings in the probate court, in great detail, in the light of the attendant circumstances. The Court concluded that when an instrument states specifically that it is a covenant not to sue, the Court cannot read into it words of release; that if the instrument shows on its face that it is a release, the word "release" is not essential. We agree with the District Court that the covenants not to sue in the case before us do not show themselves to be releases.

Clapper also argues that words of reservation are repugnant to the release and will be given no effect, citing Jenkins v. Southern Pac. Co., supra; The Adour, D.C., 21 F.2d 858, and McBride v. Scott, 132 Mich. 176, 93 N.W. 243, 61 L.R.A. 445.

In Jenkins, the Court found the reservation to be ineffective in the circumstances of that case. The very wording used:

"* * * do not in any manner or respect waive or relinquish any claim or claims against any other person, persons, firms, * * *" [17 F.Supp. 828.]

reinforced the Court's opinion that the clear intent of the instrument was to give a waiver and release as to persons named in it. No such language appears in the covenants not to sue before us.

In The Adour, D.C.Md.1927, 21 F.2d 858, the Court found that a release had been executed in New York, and that the

law of New York governed. The Court stated that if there had not in fact been complete satisfaction through the transaction covered by the release, further recovery was allowed under New York decisions. The Court found sufficient evidence in the record to indicate that full award for the injury sustained had been received, that it was apparent from the paper that the intention was to discharge the liability of one of the joint wrongdoers, that the entire liability was thereby extinguished, and that any clause by which the parties sought to reserve a right of action against the other wrongdoer was repugnant to the release and void.

In McBride v. Scott, 1903, 132 Mich. 176, 93 N.W. 243, 61 L.R.A. 445 plaintiff brought suit against a number of defendants who demurred. Judgment for defendants was appealed, reversed and remanded. Two defendants paid plaintiff a sum in excess of $1,500 and were given a release which expressly stated that these defendants were "released." The document stated that "no rights whatever are released as against the other defendants, * * *." The Court in disregarding the reservation as inconsistent found that the document was actually a release of some of the defendants. There was no question raised as to its being a mere covenant not to sue.

■ We agree with the District Court that the covenants not to sue did not discharge Clapper's liability.

The Clapper patent is directed toward utilizing the heat of a tractor engine to warm the operator and facilitate use of the tractor in cold weather. Clapper describes it as including the tractor, its frame, the engine and the fan which creates a current of air over the engine, a flexible cover surrounding the engine compartment forming a cowling between the hood and steel bow mounted in front of the operator to constitute a passageway for the heated air to the operator.

■■ Clapper did not invent a new tractor. Any conventional tractor could be used. The cowl and bow are found in early patents for automobiles. These include a number of patents not cited by the Patent Examiner, thus weakening the presumption of validity which attaches to a patent by virtue of its issuance. Johnson Laboratories, Inc. v. Meissner Mfg. Co., 7 Cir., 1938, 98 F.2d 937, 943. Channelling heat back to the operator is also found in early automobile patents, notably Standish. Similar combinations are found in earlier patents such as Winet and Weiland. Clapper employed old elements known to prior art, freely available to skilled artisans, to perform their old functions. We cannot say that the finding of invalidity was clearly erroneous. On the contrary it was well supported by the record and the law. Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 1950, 340 U.S. 147, 152–153, 71 S.Ct. 127, 95 L.Ed. 162; General Time Corp. v. Hansen Mfg. Co., 7 Cir., 1952, 199 F.2d 259, 265. In view of the District Court's careful analysis of the prior art, it is unnecessary for us to do more than refer to the District Court's findings.

Clapper sees no justification for awarding defendants attorneys' fees for prosecution of the patent defense. The District Court found the patent infringement suit was instituted by Clapper and Flora as a part of the conspiracy in violation of the antitrust laws. If that was the ground for considering the patent action "exceptional", Clapper believes that "purging of such stigma" removed the case from that category. Clapper considers the "stigma" to have ended when, following settlement of the antitrust violation on December 5, 1954, he proceeded individually and in his own right, without support or influence of Flora or their three licensees. He argues that he was under no disability to collect damages for patent infringement following cessation of the antitrust violation. As defendants point out, however, as late as 1955, Clapper was still seeking injunction and damages for the preceding 6-year period.

■■ Clapper cited patent cases in which awards of attorneys' fees by District Courts have been reversed. In these

cases the Court of Appeals found that characterization of the cases as "exceptional" was erroneous as a conclusion of law and unsupported by the record as a finding of fact. In the case before us the District Court's finding of fact No. 71 states this to be an "exceptional" case, and directs award of attorneys' fees for that reason. Defendants argue that the award is inadequate. They liken the situation here to that in Kobe, Inc. v. Dempsey Pump Co., D.C. Okl.1951, 97 F.Supp. 342, affirmed 10 Cir., 1952, 198 F.2d 416, certiorari denied 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651. There attorneys' fees incurred in defense of a patent infringement suit were held to be recoverable as damages sustained through antitrust violations. Here the District Court declined to include the attorneys' fees incurred in the patent infringement defense as an element of damages in the antitrust action (to be increased three-fold). The District Court stated that attorneys' fees were awarded because of the exceptional circumstances. Finding No. 71 reads:

"* * * Said sum, however, is not to be included as an element of damages in the antitrust action to be increased threefold, as defendants would have the court do. It is to be awarded counsel for the defendants by reason of their representing the successful parties in the patent infringement action, and by reason of the exceptional circumstances involved in the case concerning the validity of the patent and its use by the patentee and his licensees, all as found in these findings of fact." [165 F.Supp. 578.]

However, the District Court made no specific finding that the adverse party had been guilty of bad faith, inequitable, or unconscionable conduct "in the case concerning the validity of the patent." These are the usual bases for awarding attorneys' fees in patent cases. Continental Art Co. v. Bertolozzi, 7 Cir., 1956, 232 F.2d 131, 134; Wilson v. Seng Co., 7 Cir., 1952, 194 F.2d 399, 404; Apex Electrical Mfg. Co. v. Altorfer Bros. Co.,

7 Cir., 1956, 238 F.2d 867, 874. On the other hand, the District Court's reference to use of the patent by the patentee and his licensees can have reference only to the anti-trust violations. The record of this eight-year long litigation fully supports such a finding, and defendants are entitled to have their reasonable attorneys' fees and expenses included as an element of damages in the antitrust action.

■ Clapper charges the Trial Judge with error in denying motion under Rule 37(b)(2), Federal Rules of Civil Procedure, to discipline and penalize defendants for alleged failure to comply with the District Court's orders respecting production of documents and discovery under Rule 34. The District Judge gave careful, complete and repeated consideration to this question, and, after hearing evidence, found that full discovery had been made.

In listing the contested issues, Clapper includes the following:

"9. Did defendants' misrepresentations concerning the loss of records by fire and their refusal and failure to comply with plaintiff's request for discovery and with the Trial Court's order for the production of documents impose undue, unwarranted and unlawful hardship and expense upon plaintiff in making his proofs

"(a) respecting damage allegedly suffered by defendants as charged in their counterclaim;

"(b) respecting the character, purpose and duration of the Original Tractor Cab-Cab-Ette working arrangement in the fall of 1949;

"(c) respecting the breach by defendant Williams of the Clapper Williams contract entered into at the Chicago meeting of September 12, 1949."

However, the issue is not argued in the brief. Defendants, noting that fact in their brief, presume the issue to have been abandoned. The reply brief does not indicate otherwise. Review of the

record before us shows the finding of the Trial Judge to be fully supported.

■ It is Clapper's position that defendants actually proved no damage of which the antitrust violation was a proximate cause. The District Court in this regard found:

"68. The evidence shows direct loss was suffered by the defendant, Original, in salaries, wages and other expenses of shutdown from August 22 to September 23, 1949, in the total amount of $2,561.45. * * * *"

"69. The evidence shows that the defendant, Original, had negotiated for financing for continued operation which had to be dropped entirely by the shutdown following the notices sent by the plaintiff in concert with others, in August, 1949, the cost of which to the defendant, Original, was $317.20, which it is entitled to recover.

"70. The evidence shows that the defendant, Original, had expended for advertising the sum of $4,563.70, which was rendered valueless by the forced shutdown in August, 1949, as a result of said notices of infringe-ment sent to the defendant and to its distributors. * * *

"72. The evidence shows that there has been a direct loss of sales by defendant, Original, to Farm Equipment Sales Co. and Stover-Winsted Co. as a consequence of the notices of infringement sent pursuant to the conspiracy created by the License Agreement of August 3–4, 1948. * * *

"Following the time Stover-Winsted Co. and Farm Equipment Sales Co. stopped doing business with the defendant, Original, the evidence shows that during the years 1949 through the first eleven months of 1956, Farm Equipment Sales Co. purchased from Comfort Equipment Company 9,084 covers. * * *

"74. The losses heretofore stated resulted in damage to the business and property of the defendant, Original, as a consequence of the illegal conspiracy of the plaintiff Clapper, and Flora and their licensees acting in concert. For such damage, defendant, Original, is entitled to recover the following amounts of compensatory damages:

"(1) Costs resulting from forced stoppage of production, from August 22, 1949, through September 23, 1949. _____$ 2,561.45

"(2) Expenses incurred in finance negotiations. _____ 317.20

"(3) Advertising costs rendered useless by reason of forced work stoppage. _____ 4,563.70

"(4) Loss of potential sales to Farm Equipment Sales Co. for the years 1949 through the first eleven months of 1956. _____ 12,263.40

"(5) Loss of potential sales to Stover-Winsted Co. for the years 1949 through the first five months of 1952. _____ 7,905.60

"Total _____$27,611.35"

Review of the record shows ample support for these findings which cannot be held to have been clearly erroneous.

The total figure of $27,611.35 was trebled under section 4 of the Clayton Act, which brought it to $82,834.05, against which the District Court credited the $110,000 payment made by Flora and the three licensees, leaving a balance in Clapper's favor, which in turn was credited against attorneys' fees of $28,244.31 awarded for defense of the patent infringement suit as an "exceptional" case. As indicated above, in our opinion, this latter sum should have been included in the compensatory damages sustained by defendants as a result of the antitrust violation.

Clapper protests the separate award of attorneys' fees to defendants for prosecution of the antitrust phase of the case, again, on the ground that defendants failed to prove any damage which was the proximate result of the alleged antitrust violation. As indicated above, this Court concurs in the District Court's findings to the contrary.

Clapper also takes issue with the amount of $25,000 attorneys' fees allowed, as grossly disproportionate to the amount of compensatory damages proved —$27,611.35. The District Court arrived at this figure after disallowing the defendants' claim for $141,035.00 as not having a realistic relation to the amount of compensatory damages awarded. The District Court, in this aspect of the case, relied on Milwaukee Towne Corp. v. Loew's, Inc., 7 Cir., 1951, 190 F.2d 561, where this Court reduced attorneys' fees allowed by the Trial Court from about 50% to about 17% of the damages awarded.

The District Court also referred to Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 1952, 194 F.2d 846. In that case the Court of Appeals considered a fee of 40% of the damages to be such as to (194 F.2d at page 859) "shock the conscience." The Court reduced a fee awarded in the sum of $150,000 to $100,000, including fees on appeal, which was considered to be reasonable after study of the entire record and briefs.

The District Court in the case before us noted that $25,000 was only a little less than the compensatory damages found to have been sustained by defendants, and ventured to say that except for the difficulty of proof, the actual damage suffered as a direct result of the antitrust violation would have been found to be far greater.

Defendants argue that this Court has set down no percentage requirements in the Milwaukee Towne case; that we computed fees for experienced trial lawyers in Chicago at $200 per day ($40 per hour for a 5-hour day) plus $20 per hour for assistants to counsel, and thus allowed $75,000, apparently for less than 2000 hours expended. Here defendants' counsel itemized in excess of 3700 hours expended solely on the antitrust action, which does not include time in excess of 100 days expended in the patent infringement aspect of the matter. Defendants point out that the Milwaukee Towne opinion contains a favorable reference to fees of $30,000 awarded for 1300 hours in Bigelow v. R. K. O. Radio Pictures, Inc., 7 Cir., 1945, 150 F.2d 877. In the Bigelow case this Court agreed that the conspiracy had been established but reversed the judgment on the question of damages. The Supreme Court, 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, affirmed our holding with respect to the conspiracy but reversed our holding as to proof of damages. Defendants also cite Emich Motors Corp. v. General Motors Corp., 7 Cir., 1950, 181 F.2d 70. There the cause was retried after appeal to this Court and grant of certiorari by the U. S. Supreme Court, 1951, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534. On retrial, the bulk of the claims for damage was found to be barred by the Statute of Limitations, 7 Cir., 1956, 229 F.2d 714. The case is, therefore, of little assistance to us here.

In Milwaukee Towne (190 F.2d at page 571) this Court did say that allowances for services should be determined in the same manner as for those of a trial

lawyer in any other kind of a case of comparable magnitude. However, this Court also said that the result might properly be taken into consideration in fixing a reasonable attorneys' fee and that in a case of this character, the result should be measured by the amount of damages found.

Defendants contend that the measure of fees is that stated in Cape Cod Food Products v. National Cranberry Ass'n, D.C.Mass.1954, 119 F.Supp. 242, 244:

> " * * * The rate is the free market price, the figure which a willing, successful client would pay a willing successful lawyer. Sometimes the figure may seem high."

and in Darden v. Besser, 6 Cir., 1958, 257 F.2d 285, 286:

> "While the allowance of reasonable attorneys' fees is always a matter of delicacy * * * the object always, of course, is to allow just and fair compensation for the services rendered, considering the time and skill employed, the experience brought to bear, and the result achieved."

Clapper further disputes the value of counsel's services on another ground. He maintains that counsel's task was made exceptionally easy by the fact that the same proofs needed in the instant case to prove violation of the antitrust laws and the existence of a conspiracy, had already been made and the issues resolved in the Kansas City case: Mason City Tent & Awning Co. v. Clapper, D.C.1956, 144 F.Supp. 754. In that case $5000 attorneys' fees were awarded. Counsel for Mason City, et al. in that case, Clapper adds, was also principal counsel for defendants here. Exhibits, interrogatories, pleadings etc. were markedly similar in both cases. Associate counsel in the two cases were not the same, but Clapper argues that their qualifications were much the same. He relies on Bordonaro Bros. Theatres v. Paramount Pictures, D.C.N.Y.1953, 113 F.Supp. 196, where attorneys' fees of $18,000 had been awarded in an earlier trial, but only $4,-500 allowed on a second trial, which the Court there held to be substantially less demanding, although proof of continuing conspiracy was required for the second trial.

Defendants in reply point out that when their counterclaim was filed in 1950 and for several years afterward, Original alone was contesting the efforts of Clapper and his co-conspirators to control the market in tractor covers. Counsel for defendants were obliged to meet objections of Clapper and Flora to joining the licensees as cross-defendants, as well as claims of estoppel, *pari delicto* and the like, all of which required briefing, argument and trial. This case was pending for eight years. On the other hand, the Mason City case was not filed until June 11, 1954. Thus the Mason City case, although tried first, was greatly simplified by the discovery and preparation made for this case, rather than the reverse.

Clapper reasons that use of the italicized wording in section 15, Title 15 U.S.C.A., means that attorneys' fees are part of the costs in an antitrust action:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws * * * shall recover * * * *the cost of suit, including a reasonable attorney's fee.*"

We cannot agree that attorneys' fees are meant to be thus included as an item of the usual "costs" taxed against the unsuccessful litigant. Clapper further concludes that the attorneys' fees for defendants' counsel are barred for the period up to and including December 14, 1954, the date of the order dismissing Flora and the licensees. That order stated:

> "4. That no costs be awarded to any party litigant designated in this Order, the respective parties litigant bearing their own costs."

Two of the named parties litigant are Original and Williams.

The District Court considered it unreasonable that Clapper should be completely exonerated from payment of all

costs and attorneys' fees for a period of time during which he was as much a litigant as at any other time during the long controversy concerning a conspiracy from which he reaped the greatest benefit. However, the District Court specifically stated that the Court was not wholly ignoring Clapper's theory, and in determining a reasonable attorneys' fee, the Court would consider, as a weight factor, the recovery made and the attorneys' fees received in connection with the $110,000 paid by Clapper's co-conspirators.

■ It appears to this Court that the learned Trial Judge in the exercise of his discretion to set attorneys' fees, in the antitrust action, gave studied attention to all of the pertinent factors impinging on this delicate matter. We find no abuse of discretion in this regard, and conclude that interference with the amount set would be unwarranted in this case.

Clapper also assigns as error the District Court's refusal to consider defendant Williams' alleged breach of a contract made with Clapper. Clapper asserts that on September 12, 1949, in Chicago, after denial of Williams' request for a license, Clapper made an oral agreement with Williams (afterwards confirmed in writing) whereby Williams agreed that Original would discontinue manufacture of the accused device in return for Clapper's permission to dispose of the inventory on hand. Clapper charges that Williams breached this agreement by making an arrangement with one of the licensees, Cab-Ette, to allow continuance of manufacture and sale of the accused device, which was then designated "Original Cab-Ette" and marked with the patent numbers of both the Flora and Clapper patents. Defendants paid a royalty to Clapper on all Original Cab-Ette covers made during the life of this arrangement, which terminated by the end of November, 1949. At that time, defendants changed the designation from "Original Cab-Ette" to "Original Half/Cab," and notified Clapper that they were resuming manufacture. It was this action, Clapper says, which led to the filing of the complaint in this case on April 14, 1950.

Clapper contends that defendants' conduct in this connection estops them from denying the validity of the Clapper patent and from asserting violation of the antitrust laws because they had brought themselves under the cloak of the group license of August 3–4, 1948.

As in the case of contested issue No. 9, mentioned above, these propositions are set forth in the list of contested issues in Clapper's brief, but are not included in the argument. In their brief in answer, defendants presume these issues have been abandoned. Clapper does not contradict that presumption in his reply brief, although he includes the following in his "conclusions":

> "3. That when defendants could not obtain a license under plaintiff's patent through legitimate channels they breached an agreement with plaintiff to discontinue infringement and negotiated a clandestine arrangement with one of plaintiff's licensees, the Cabette Co., in order to continue in business under the pale of plaintiff's patent rights."

■ The District Court did not refuse to consider these issues. We need not labor the point; it is sufficient to quote the District Court's findings:

> "35. The spokesman for the several parties to the Agreement of August 3–4, 1948, upon rejecting the application of the defendants for a license under the Clapper patent, in the meeting on September 12, 1949, informed the defendants that the defendant, Original, would be given a limited period of time within which to dispose of its stock of tractor covers then in course of manufacture and that if the defendants then ceased the manufacture of tractor covers, no action for patent infringement would be instituted. The evidence does not establish that an agreement was reached between the plaintiff and defendants in that meeting in Chicago on September 12, 1949, or subsequently. Any proposals made to the defendants in that

meeting were in furtherance of a conspiracy in violation of antitrust laws, * * * Plaintiff has alleged and relies upon the theory that a contract was entered into between the defendants and the several parties to the Agreement of August 3–4, 1948, and that he, plaintiff Clapper, has been damaged as a result of the breach of said contract on the part of the defendants. There is no evidence in the record of damages to the plaintiff flowing from the alleged breach, even if it were assumed that an agreement was reached, which the court does not find.

"36. Thereafter, the defendants entered into a working arrangement with Cabette, formed for the use of the Original facilities to manufacture parts of tractor covers for Cabette, which working arrangement became effective the latter part of October, 1949. A proposed contract to formalize the working arrangement was reduced to a writing dated November 4, 1949. Before the execution thereof by both parties, disagreement arose, and the proposed contract was not executed. The working arrangement was terminated by mutual consent. A proposed settlement contract dated November 23, 1949, was prepared. Before the execution by both parties, a controversy arose, and the contract was unexecuted by both parties.

"37. The defendants prior to the filing of this action by the plaintiff, had no knowledge of the terms and provisions of the License Agreement of August 3–4, 1948, except with respect to the place of manufacture of the tractor covers with the permission of Clapper.

"38. The defendants discontinued the manufacture and sale of the Original products and entered into a working arrangement with Cabette. This arrangement was made in order to afford Cabette the working facilities of Original whereby Original could manufacture parts

for Cabette, and at the same time, it was a means of keeping Original in operation.

"39. During the working arrangement between Cabette and the defendants, the defendants notified the plaintiff that they were discontinuing the manufacture and sale of tractor covers in accordance with the direction by the spokesman for the group at the meeting in Chicago, as aforesaid, on September 12, 1949, which notice was retracted, however, after the discontinuance of the working arrangement with Cabette in November, 1949.

"40. During the working arrangement with Cabette, the defendants operated only as suppliers for Cabette by direction of the latter and did not thereby become licensees under the Clapper patent nor parties to the conspiracy; whereby the defendants are not estopped from contesting the validity of the Clapper patent nor from claiming damages for violation of the antitrust laws, according to the first cause of action of the amended complaint."

■■■ Lastly Clapper urges that the District Court erred in awarding defendants costs in this action. Clapper attributes the major portion of the costs to the period of the venue dispute concerning the cross-defendants, in which he alleges he had no interest. Further he relies on the terms of the order of dismissal following the settlement between Flora, the licensees, and defendants, whereby the District Court directed that the respective parties litigant bear their own costs. Clapper's position is that this is the law of the case up to the date of that order (December 14, 1954) and that he had a right to rely on it to free him from costs which he otherwise would have shared with Flora and the three licensees.

The District Court found Clapper to have been as much a litigant to the venue issue, involving his co-conspirators (and the appeal taken therefrom) as at any other time, and held Clapper not to have

been relieved, by the order of December 14, 1954, from payment of a just portion of the costs during the venue litigation. The District Court considered the costs in detail and disallowed a great bulk of the defendants' original bill of costs.

Here, and in the District Court, Clapper raised objections to the item of $744.44 paid for carbon copy of transcript of the main trial. The District Court found that it was a custom of long standing, in that Court, that in any case where a party ordered a transcript of evidence, the original must be furnished to the Trial Judge and the expense of same borne by the party ordering the transcript or as the Court otherwise directs. In view of the complexity of the case, the District Court thought it was reasonable for counsel to have a transcript of the evidence and minutes of trial, plus one copy for use in conduct of the trial and post-trial procedures. The District Court disallowed reporter's fees and charges for transcript of oral arguments.

Clapper also objects to costs for photostats which are unidentified. When this objection was addressed to the Trial Judge, the latter indicated regret that an itemized list had not been kept identifying each document with an explanation of its use. The Trial Judge said that ordinarily he would sustain the objection, but that in this case, the judge himself personally recalled many conferences and informal agreements among counsel with respect to furnishing copies of documents, and, as this was a matter within the Court's judicial discretion, and the amount of $207.98 was also supported by oath of counsel, he allowed that sum as costs. In view of all the attendant circumstances, we cannot say that there was an abuse of discretion with respect to allowance of costs.

Defendants' position is that the District Court erred in awarding inadequate damages. They ask that this cause be remanded for recomputation of the damages to include losses from potential sales and losses attributable to the arrangement with Cab-Ette. Defendants cite a number of cases to support their contention that losses of profits may be determined by the calculations of a certified public accountant according to proper accounting practices. None of these cases involved the precise method of calculation used here. The District Court describes defendants' method as follows:

"* * * Briefly and generally, the theory of the defendant, Original, as explained by its president, Williams, and its accountant, Morgan, involved the process of taking the number of dealers the defendant, Original, had prior to the summer of 1949, at which time it changed its sales methods from dealers over to distributors. Williams explained he was very careful in making his calculations in order to stay on the conservative side. In his survey of existing dealers, he found there were 901 dealers listed. But of the 901 listed dealers he could find only 684 cards showing actual sales to such dealers. Therefore in his calculations he used the figure of 684 dealer cards as the basis from which to test the average potential sales to the established dealers. Among the 684 dealers, he found that 336 had sent orders in and had purchased half/Cabs. The 336 dealers purchased 1,275 half/Cabs. By taking the number of purchases of half/Cabs and relating them to the number of dealers who had actually purchased half/Cabs, he found that the company sales amounted to three and eighty hundredths half/Cabs per dealer. By relating the company sales of half/Cabs to all of its dealers, he found that the company's average sales of half/Cabs per dealer amounted to 1.86 half/Cabs.

"After the establishment of the distributorships, Williams made a survey in order to determine the total number of dealers served by the distributors. It was found that the distributors serviced 17,450 dealers. Commencing with the year 1949, the first year defendant, Original, had distributors, and the first

year of the impact of the conspiracy, the defendant, Original, estimated the sale of one unit to each dealer served by its distributors. Thus, it estimated its potential sales for the year 1949 at 17,450 units. Taking the year 1950 as the base year and applying the annual percentage growth in tractor population in the United States and applying such percentages of tractor population growth to the subsequent years to and including the year 1956, and by applying the estimated unit sales per dealer of 1.86, defendant thereby arrived at the respective total unit potential sales for the years 1950 through 1956. * * *

"By eliminating what defendants' accountant determined to be abnormal operating expenses by reason of the impact of the conspiracy and the attendant litigation, the accountant arrived at an adjusted net unit profit per half/Cab. By further applying the estimated unit potential sales as estimated by Williams according to his estimated sales per dealer as related to tractor population growth, defendant established a different and higher net unit profit through the commensurate savings in overhead costs per unit due to the greater estimated production. By applying the greater net unit profit to the respective annual estimated potential sales, the accountant arrived at the total dollar profits which defendants claim could have been realized on potential sales except for the impact of the conspiracy for the period 1949–1956, which amounted to $1,364,200.10. From this was deducted the actual profit realized from sales of half/Cabs as reflected by the accountant's pro-forma earnings statement adjusted to eliminate the abnormal effects of the conspiracy and litigation. The realized profits from actual sales of half/Cabs during the period amounted to $79,996.17. Subtracting the realized profits from the total estimated profits, the account-ant arrived at the figure of $1,284,-203.93, which the defendants claim represents the total profits that could have been realized on the estimated potential sales except for the anti-trust violations by plaintiff Clapper, together with Flora and their licensees." [165 F.Supp. 580.]

In American Cooperative Serum Ass'n v. Anchor Serum Co., 7 Cir., 1946, 153 F.2d 907, 914, the District Court based judgment on the evidence of a certified public accountant who tabulated each of plaintiff's sales made at 65 cents (to meet unfair price-cutting) and also calculated the amount of each item had it been sold at 75 cents. The difference between the two totals was the amount on which judgment was based.

Central Coal & Coke Co. v. Hartman, 8 Cir., 1901, 111 F. 96, concerned a "club" formed to control the price of coal in Kansas City, Kansas, and Kansas City, Missouri. When plaintiff withdrew from the "club" his former associates refused to sell to him except at prices only 50 cents per ton less than that established for retail sale to consumers. In that case the Court of Appeals reversed a judgment for plaintiff on the ground that speculations, guesses and estimates of witnesses were insufficient bases for recovery. The Court mentioned (111 F. at page 98) " * * * the general rule that the expected profits of a commercial business are too remote, speculative, and uncertain to warrant a judgment for their loss. (citing cases)." The Court then set forth the exception to the general rule: that loss of profits from the interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his loss actually was.

Kiefer-Stewart Co. v. Joseph Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, involved an agreement among competitors in interstate commerce to fix maximum resale prices of their products. When plaintiff refused to subscribe to that policy, his name was struck from the list of authorized distributors. The opinion of the Supreme

Court does not touch on the method of computing damages but deals solely with reversing this Court's decision that a violation of the Sherman Act had not been proved. In the opinion of this Court, reported at 7 Cir., 1950, 182 F.2d 228, the method of computing damages was never reached. Study of the briefs in the Kiefer case indicates that the primary objection to testimony of the accountant was that his evidence was based on hearsay in that certain books and records were not in evidence. He testified as to the actual dollar volume of sales during 1946, 1947, 1948 and the first quarter of 1949. He then testified to costs and expenses based on actual experience which Kiefer would have incurred had it realized, in 1947, 1948 and the first quarter of 1949, the additional volume of sales necessary to bring its actual sales to the level of 1946. He also testified to the resulting percentage of profit to sales and resulting total amount of profit which would have been realized on such additional volume of sales. The accountant was employed by a firm which had audited Kiefer's books for more than twenty years. There had been a showing that the books and records were voluminous in character. A member of the corporation and the auditor testified to the accuracy of the books and records. In spite of the burden involved, Kiefer's counsel had twice offered to produce the books in court. The District Court refused to permit proof that only one-third of the drop-off in sales volume was attributable to a general statewide decline in the volume of wholesale business after 1945, such proof being based only on check of the Indiana Alcoholic Beverage Commission's figures on liquor stamp sales.

In William H. Rankin Co. v. Associated Bill Posters of U. S., etc., 2 Cir., 1930, 42 F.2d 152, the Trial Court permitted the Treasurer to show by his compilations, based on net profits of the business in 1911 and his knowledge of business conditions when free of the defendants' unlawful interference, what he considered would have been the probable yearly earnings from July 1913 to June 30, 1918, and to explain how he arrived at his figures. The Court of Appeals said that whatever might be said of the weight of the testimony, that was entirely for the jury.

The Trial Judge sitting as jury in the case before us weighed the evidence adduced by defendants and found their theory of computing estimated potential sales to be unrealistic. The Trial Judge noted (*inter alia*) that the theory assumed each of the distributors and dealers would continuously handle and sell the product throughout the years involved, although one firm included in the list of dealers discontinued the sale of tractor cabs in 1952 or 1953. It also assumed climatic conditions and the absence of peaks and valleys in annual sales, which the Trial Judge said was inconsistent with the actual experience of defendants' competitors.

In Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 1952, 194 F.2d 846, Brookside Theatre Corp. charged that it had been driven out of business and had been forced to turn over its theatre to one of the defendants. The Trial Court admitted evidence of a certified public accountant who had examined the books produced by defendants to show the operations and profits of the theatre after the sale by Brookside.

In Eastman Co. of New York v. Southern Photo Co., 1927, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684, the Court found that there was substantial evidence to show that prior to 1910 Southern Photo Co. had an established business in selling to professional photographers supplies largely purchased from Eastman. Southern also took on a non-conflicting line of goods for amateurs. When, because of the monopoly, Southern was no longer able to supply professionals, it lost most of its established trade in such goods, although the business was so organized that Southern would have been able to handle Eastman's goods with no increase in its general expenses and no additional cost except that incident to handling such goods themselves. Plaintiff sought to re-

cover, as loss of profits, the amount of its gross profits on Eastman's goods during the four years preceding the period in suit, which was shown, less the additional expense (which was estimated) which would have been incurred in handling defendant's goods during the four year period in suit.

Eastman objected to this use, as a standard, of profits earned during the four years Southern had been Eastman's customer, on the ground that Southern had participated in Eastman's unlawful acts and was in *pari delicto*. However, there was evidence from which the jury could have concluded otherwise, and uncontradicted, affirmative evidence that under Eastman's restricted terms of sale, the dealers' profits did not exceed those on sale of goods of other manufacturers not parties to the monopoly.

In Story Parchment Co. v. Paterson Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, three companies maintained uniform prices and enjoyed a substantial monopoly of the interstate trade in parchment paper. The Trial Court submitted two items of damage for the consideration of the jury: (1) the difference, if any, between the amounts actually realized by Story and what it would have realized from sales at reasonable prices but for the acts of the defendants and co-conspirators; and (2) the extent to which the value of Story's property had been diminished by such acts. The Court there found that there was evidence from which the jury could have found that, in pursuance of the conspiracy, goods had been sold below the point of fair profit and below cost of production. In that case, the evidence also included a detailed showing that current prices were higher during a period antedating the unlawful combination, and that there had been price cutting afterward. The Court held that it was fair to say that the natural and probable effect of the combination and price cutting would be to destroy normal prices. Story put in evidence of prices received before and after. The Court said that while damages may not be determined by mere speculation or guess, it was sufficient if the evidence showed the extent of the damages as a matter of just and reasonable inference, although the result was only approximate.

We agree with the District Court that defendants' theory of computation, as described above, does not meet this standard of "just and reasonable inference."

In Bigelow v. R. K. O. Radio Pictures, 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, to demonstrate the damages suffered from a discriminatory system of motion picture showings, petitioners introduced a comparison of earnings, during a five year operation of their own theatre with earnings, during the same period, of one of respondents' theatres (comparable in size, but inferior in location, equipment, and attractiveness to patrons) which had been allowed to exhibit pictures ahead of petitioners. Other evidence dealt with petitioners' operation during a period when it had been able to find and show some films which had not been selected by respondents' theatres and thus had not been previously shown there. This period was contrasted with operations after the practice of showing double-features made it almost impossible to find any films which had not been selected for previous showing in respondents' theatres. The Supreme Court found these two classes of evidence not to be mutually exclusive, and the Court further held that the evidence of damage was sufficient to support the jury's verdict. Here, too, the Court said (327 U.S. at page 264, 66 S.Ct. at page 579) " * * * even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." That is what the District Court did in the case before us.

It appears to us, as it did to the District Court, from a study of the record, that there is no preponderance of evidence to show that Clapper (and his licen-

sees) through any conspiratorial act caused the losses arising out of the working arrangement with Cab-Ette.

In view of the position we have adopted with respect to the issues discussed, it would only unduly lengthen this opinion to comment in detail on other arguments, advanced by counsel for both parties, which were considered by this Court.

The judgment of the District Court is affirmed in all respects except as to failure to include attorneys' fees and expenses incurred in the patent infringement defense as an element of damages in the antitrust action. As to that aspect of the case only, the judgment is reversed and the cause is remanded for entry of order in conformity with this opinion.

In part affirmed.

In part reversed and remanded with directions.

PARKINSON, Circuit Judge (concurring in part and dissenting in part).

I concur in that part of the result reached by Judge KNOCH in his opinion which affirms the judgment of the District Court. However, I am compelled to respectfully dissent to that portion of the opinion reversing for failure to include attorney fees and expenses incurred by counsel for Original in the defense of the patent infringement phase of the case as an element of treble damages in the antitrust action under the counterclaim.

The District Court made the award under authority of 35 U.S.C.A. § 285 by reason of the *exceptional* circumstances involved in the case concerning the validity of the patent and its use by Clapper and his licensees but specifically declined to include the award as an element of damages in the antitrust action under the counterclaim.

15 U.S.C.A. § 15 provides that one who shall be injured in his business or property by reason of anything forbidden in the antitrust laws shall recover threefold the damages sustained by him, plus the cost of suit including a reasonable attorney's fee.

It is a well settled rule of construction that language used in a statute which has a settled and well known meaning, sanctioned by judicial decision, is presumed to be used in that sense by the legislative body, Kepner v. United States, 1904, 195 U.S. 100, 124, 24 S.Ct. 797, 49 L.Ed. 114, or, as stated by the Supreme Court in another way, "where words are employed in an act which had at the time a well known meaning in the law, they are used in that sense unless the context requires the contrary." Case v. Los Angeles Lumber Co., 1939, 308 U.S. 106, 115, 60 S.Ct. 1, 7, 84 L.Ed. 110.

When 15 U.S.C.A. § 15 was enacted by Congress, the word "damages" had acquired, through judicial interpretation, a well understood legislative meaning and it did not include attorney fees incurred in defending civil actions. Oelrichs v. Spain, 1872, 15 Wall. 211, 82 U.S. 211, 231, 21 L.Ed. 43; Flanders v. Tweed, 1872, 15 Wall. 450, 82 U.S. 450, 453, 21 L.Ed. 203; Tullock v. Mulvane, 1902, 184 U.S. 497, 511, 22 S.Ct. 372, 46 L.Ed. 657; Missouri, Kansas & Texas R. Co. v. Elliott, 1902, 184 U.S. 530, 539–540, 22 S.Ct. 446, 46 L.Ed. 673; Straus v. Victor Talking Mach. Co., 2 Cir., 1924, 297 F. 791, 797. There is nothing in the Act to the contrary, and, in my opinion, any legal basis for an attorney fee allowance in the successful defense of the patent infringement phase of this action could emanate from and find its source only in 35 U.S.C.A. § 285.

As I read the case of Kobe, Inc. v. Dempsey Pump Co., 10 Cir., 1952, 198 F.2d 416, I am impressed with the thought that the question of the right to include counsel fees incurred in the successful defense of a patent infringement suit as an element of damage in an antitrust action was not squarely raised and decided by the Tenth Circuit, although the District Court so held. However, if the Tenth Circuit did so decide, I am constrained to disagree and am of the opinion that the Second Circuit was correct in its decision in Straus v. Victor Talking Mach. Co., 297 F. 791.

The District Court made an award of $25,000 for the services of counsel for Original in the antitrust action under its counterclaim pursuant to 15 U.S.C.A. § 15 and made an award of $28,244.31 for the services and expenses of counsel for Original in the defense of the patent infringement action under the complaint pursuant to 35 U.S.C.A. § 285. I am convinced the refusal of the District Court to include the latter award as an element of treble antitrust damages is not erroneous under the circumstances here.

I would affirm the judgment of the District Court in its entirety.