The **BENDIX CORPORATION** and **Sellew Corporation, Plaintiffs-Appellants,**

v.

**BALAX, INC.** and **John M. Van Vleet, Defendants-Appellees.**

**No. 71–1483.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1972.

Nov. 29, 1972.

Rehearing and Rehearing En Banc Denied Jan. 6, 1973.

Maxwell H. Herriott and Thomas O. Kloehn, Louis H. Parent, Milwaukee, Wis., for defendants-appellees.

Edward L. Foote and Brian A. Loftus, Daniel C. McEachran, Chicago, Ill., John R. Collins, Milwaukee, Wis., Harold S. Barron, Secretary and Gen. Counsel, Bendix Center, Southfield, Mich., for plaintiffs-appellants.

Before HASTINGS, Senior Circuit Judge, and CUMMINGS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal involves primarily the scope of the retroactive application of Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1886, 23 L.Ed.2d 610 (1969).

I

This suit was commenced on June 17, 1964, seeking to enjoin, and for an accounting of profits and damages resulting from, defendants' alleged infringement of three patents owned by the plaintiff relating to a fluteless swaging tap.[1]

Before trial, plaintiff withdrew its patent No. 2,991,491, admitting its invalidity due to plaintiff's own prior public use. The trial court held plaintiff's patent Re. 24,572 valid and infringed and patent No. 3,050,755 infringed but invalid for prior public use by plaintiff. It dismissed defendants' antitrust counterclaim. Besly-Welles Corp. v. Balax, Inc., 291 F.Supp. 328 (E.D.Wis.1968).

Upon appeal, this Court affirmed the judgment of invalidity of No. 3,050,755 and reversed the judgment of the validity of Re. 24,572. Bendix Corp. v. Balax, Inc., 421 F.2d 809 (7th Cir.), cert. denied, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970).[2]

The Court vacated that part of the judgment dismissing defendants' antitrust counterclaim in order to consider "the relevance, if any, of *Lear*."[3]

---

1. "A tap is a tool used to form threads on the cylindrical inner surface of a hole. A swaging tap forms threads by deforming the metal and displacing it into the form of the desired thread. A swaging tap, which forms no chips, is to be distinguished from a cutting tap which forms threads by cutting away the metal with cutting teeth. The swaging method is said to be more economical and easier to perform than the cutting method. Swaging taps have a longer life than cutting taps. They produce no metal chips. The costly and time consuming inspection and cleaning of the work after the job is completed is thus eliminated." Bendix Corp. v. Balax, Inc., 421 F.2d 809, 811 (7th Cir.), cert. denied, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970). In order to produce a cutting tap, a fluted blank is needed on which to grind the threads. The machine needed to produce the fluted blank is relatively expensive. Swaging taps have no flutes (or parallel grooves) so that fluted blanks are not needed. Thus the maker of swaging taps needs only a thread grinding machine and not an expensive flute grinding machine.

2. Suit was originally brought by Besly-Welles Corporation, an Illinois corporation, whose name was later changed to Sellew Corporation. In 1965, Besly-Welles Corporation, a Delaware corporation, was incorporated as a wholly-owned subsidiary of the Bendix Corporation. The subject patents were transferred from the Illinois corporation to the Delaware corporation and the Bendix Corporation was substituted as a party in this case.

3. This Court said at 421 F.2d 820, 821:
"While it is true that a valid patent does afford some 'limited protection,' including 'the right to license others to manufacture the patented tap,' this is no answer to the thrust of defendants' con-

Upon remand, the district court concluded that the defendants had established their counterclaim and were entitled to judgment. The district court considered that this court's statement that "the right to estop licensees from challenging a patent is not part of the 'limited protection' afforded by the patent monopoly," constituted the law of the case. Then, inasmuch as many of plaintiff's license agreements contained "a concession by the contracting party either that it would not legally challenge the Besly patent or that it acknowledged the patent's validity" and inasmuch as some of those concessions were to continue "during the life of this agreement or thereafter," the district court concluded that "Besly had gained and retained control of a substantial portion of the swaging tap market." Bendix Corp. v. Balax, Inc., 321 F.Supp. 1095, 1096 (E.D.Wis.1971).[4]

## II

The basic facts may be summarized as follows: Until 1950 a cutting tap was the only tool available in the United States for internal thread forming. In 1950 at least two manufacturers began making swaging taps. In 1957 the plaintiff commenced marketing its improved swaging tap in regard to which it eventually obtained three patents.

Plaintiff's earliest swaging tap patent was issued in 1957 and reissued as Re. 24,572 on December 2, 1958. Patent No. 2,991,491 was issued on July 11, 1961. Patent No. 3,050,755 was issued on August 28, 1962.

Defendant Balax was incorporated in 1959 and defendant Van Vleet has been its president since then. From May to November 1961, Van Vleet met and communicated with representatives of plaintiff, at which time Van Vleet disclosed that he had been developing what he considered a superior type of swaging tap. The discussions included the possibility of a cross-license agreement between Balax and plaintiff. Van Vleet took copious notes of these discussions, which ended without any agreements being reached.

---

tention that the licensor may not thereby forever preclude the licensee from challenging the validity of the patent. By requiring such a condition in the license or sales agreement, plaintiff may have placed itself in the position of unlawfully exceeding the protected area.

"Further, subsequent to the judgment of the district court under consideration here, the Supreme Court in Lear, Inc. v. Adkins, 395 U.S. 653 (June 16, 1969), at 668–671, 89 S.Ct. 1902, 23 L.Ed.2d 610 overruled the holding of Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), insofar as it invoked a legally implied estoppel to deny a licensee the right to challenge the validity of his licensor's patent in a suit for the collection of royalties.

\* \* \* \* \*

"From all this we can only conclude that the right to estop licensees from challenging a patent is not part of the 'limited protection' afforded by the patent monopoly. Furthermore, the reason is that it creates a danger of unwarranted monopolization. Such danger may be even greater here than in the usual licensee-estoppel case for the reason that

in the instant case the licensor sought to create an irrevocable estoppel, not one merely extending during the life of the licenses and sales agreements.

"The parties did not address themselves to the relevance, if any, of *Lear* in the present appeal, and, of course, it could not have been considered by the district court. Under these circumstances, we feel it should be first presented to the trial court for its consideration."

4. The district court said: "I find that in actual practice, Besly was able to, and did, monopolize the swaging tap market and improperly influence the pricing structure for the commodity. Besly was able to negotiate the royalty rate charged to licensees in a substantial portion of the market and was able to exert an excessive influence on pricing. Having obtained concessions as to the 'validity' of its now invalid patent, and having obtained waivers regarding judicial action, Besly was able to, and did, monopolize the swaging tap market. Besly's opportunity to monopolize was enhanced by its having commenced actions against alleged infringers or by threatening to so do." *Id.*

Balax sold its first swaging tap on January 3, 1962, and later obtained a patent on its "no lead error" swaging tap.

When plaintiff filed its complaint for infringement on June 17, 1964, it also charged that Balax and Van Vleet had appropriated plaintiff's trade secrets. The district judge, after the original trial, found that the information disclosed by plaintiff to Van Vleet took great effort to develop, had value to plaintiff, and was claimed by plaintiff to have been used by the defendants as a short cut to get into the swaging tap business. 291 F.Supp. at 344–346. Nevertheless, the district court "concluded that while the information disclosed by plaintiff constituted trade secrets, no confidential relationship existed between the parties." 421 F.2d at 821. This Court affirmed the district court's finding that the defendants were not liable for appropriation of plaintiff's trade secrets.

At the time the infringement suit was filed in 1964, plaintiff had license contracts with ten companies to act as either a manufacturing licensee or sales outlet. Several others were added prior to June 22, 1970, when the Supreme Court denied a petition for certiorari from this Court's opinion invalidating plaintiff's last patent. 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562. At that time, plaintiff notified all of its licensees of the cancellation of their agreements.

According to flow diagrams furnished by both plaintiff and defendants in their briefs, prior to June 22, 1970, (1) plaintiff sold some of its·kind of taps to distributors; (2) plaintiff sold other of its kind of taps to purchasing licensees who in turn sold them to other distributors; (3) plaintiff's manufacturing licensees manufactured plaintiff's kind of taps and sold them to other distributors; (4) defendant Balax sold its own patented kind of taps to other distributors; and (5) Balax's licensed manufacturers made Balax's kind of taps and sold them to yet other distributors. Thus both plaintiff's and Balax's respective kinds of swaging taps reached the hands of some of the approximately 20,000 independent distributors of swaging and cutting taps. These distributors, in turn, resold the taps to hundreds of thousands of machine shops and other tap users throughout the country.

In seeking to support the judgment of the district court upholding their counterclaim, the defendants have relied primarily upon (1) the provisions of several of plaintiff's license agreements which provided substantially that "Licensee agrees that it will not contest the validity of any patent which is now a part of this Agreement during the life of this Agreement and thereafter"; (2) the provisions of several of plaintiff's sales contracts wherein the tap purchaser acknowledged the validity of the underlying patent or patents without limiting the acknowledgment to the life of the sales arrangement; (3) the bringing or threatening to bring of patent infringement suits by the plaintiff; and (4) the granting of nonexclusive licenses and the exaction of royalties by plaintiff as consideration for not bringing infringement suits.

### III

In the prior appeal, Judge Hastings, speaking for this Court and after pointing out that defendants' counterclaim charged two violations of federal antitrust laws, the first of which was "illegal procurement and enforcement of patents" under the doctrine of fraud-practiced-on-the-patent-office of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), said at 421 F.2d 819:

"The district court specifically found that defendants had not met their burden of proving fraud on the patent office by clear and convincing evidence as required in Armour & Co. v. Wilson & Co., 7 Cir., 274 F.2d 143, 148 (1960). Our examination of the record leads us to conclude that such finding is not clearly erroneous and thus we accept it. Accordingly, the

conclusion of the district court that this claim of antitrust violation is without merit should be approved."

This conclusion constituted the law of the case and established that the invalidity of the plaintiff's patent was the result of an error of judgment by the patent office based upon good faith applications by the plaintiff. Hence, the fact of invalidity has no probative value in the case in attempting to establish any antitrust violation.

The defendants' second contention of plaintiff's violation of Sections 1 and 2 of the Sherman Act, as analyzed by Judge Hastings in the first appeal, was that "even if all of plaintiff's patents were valid, plaintiff would be guilty . . . for the reason that they have misused their patents to extend the patent monopoly beyond the scope permitted by the Constitution and the Congress." *Id.*

■ Every patent misuse does not constitute a *per se* antitrust violation,[5] excusing proof of precise damage or foreclosing inquiry into reasonableness.[6] The Report of the Attorney General's National Committee to Study the Antitrust Laws 254 (1955) concluded that "[f]rom some abuses of patent policy may flow consequences not drastic enough to meet antitrust prerequisites of effect on competition."[7]

Therefore we must determine whether a patent misuse occurred and if so, its nature and whether it constituted an antitrust violation.

## IV

■ Congress has made it clear that the exaction of a royalty and the

5. "And if there was such patent misuse, it does not necessarily follow that the misuse embodies the ingredients of a violation of either § 1 or § 2 of the Sherman Act, . . ." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 140, 89 S.Ct. 1562, 1585, 23 L.Ed.2d 129 (1969).

6. The causes and effects of *per se* antitrust violations were capsulated in Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) : "However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210 [, 60 S.Ct. 811, 838, 84 L.Ed. 1129] ; division of markets, United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271 [L.R.A.122], affirmed 175 U.S. 211 [, 20 S.Ct. 96, 44 L.Ed. 136] ; group boycotts, Fashion Originators' Guild [of America] v. Federal Trade Comm., 312 U.S. 457 [, 61 S.Ct. 703, 85 L.Ed. 949] ; and tying arrangements, International Salt Co. v. United States, 332 U.S. 392 [, 68 S.Ct. 12, 92 L.Ed. 20]."

7. "We reject the view that any violation of patent law necessarily violates the antitrust laws. From some abuses of patent policy may flow consequences not drastic enough to meet antitrust prerequisites of effect on competition. In addition, many patent abuses are more effectively curbed by simply denying equitable relief as a matter of patent policy. Holding every patent law transgression to be the same as an antitrust violation would, moreover, put the patent owner on a different footing than owners of other property subject to antitrust. For antitrust has its own measure of permissiveness and wrongful conduct. To say that action beyond the borders of the patent grant is a *per se* antitrust violation is to ignore the Supreme Court's distinction between the variant statutory standards of the Sherman, Federal Trade Commission and Clayton Acts as well as to repudiate the body of interpretations distinguishing between offenses unreasonable *per se* and those not."

granting of a non-exclusive license as consideration for not suing for infringement, or suing to prevent infringement, do not constitute, in and of themselves, misuse of a patent.[8] As we indicated in the prior appeal and hold in this one, whether any antitrust violation has occurred must be measured as though the plaintiff's patents were valid. Correlatively, an infringement suit does not become an antitrust violation because a patent is held invalid.[9]

The district court concluded that plaintiff monopolized the swaging tap market by, among other matters, "[h]aving obtained concessions as to the 'validity' of its now invalid patent, and having obtained waivers regarding judicial action." 321 F.Supp. at 1096.[10]

In 1950, the Supreme Court held that "the general rule" was that a patent licensee operating under a license agreement was estopped to deny the validity of his licensor's patent in a suit for royalties. Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc., 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312.

All of the licensee restrictions imposed by the plaintiff occurred subsequent to 1950. The plaintiff commenced its infringement suit in 1964. The district court's first judgment was rendered in 1968.

On June 16, 1969, the Supreme Court decided Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610, holding that a licensee is not estopped to interpose the invalidity of the licensed patent as a defense to an action by the patentee-licensor to enforce the license agreement. The Court expressly overruled its 1950 holding to the contrary.[11]

Thereafter, we remanded this case to the district court to consider "the relevance, if any, of Lear." 421 F.2d at 821. The district court apparently assumed that Lear was relevant and that the license restrictions constituted per se antitrust violations in the light of Lear. The court did not consider whether Lear is to be applied retroactively.[12]

Recently the Supreme Court in Chevron Oil Co. v. Huson, 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971), summarized the factors to be considered in determining whether unconstitutional, noncriminal cases are to

8. Section 271(d) of the Patent Code provides that "No patent owner . . . shall be . . . deemed guity of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement." 35 U.S.C. § 271(d).

9. 35 U.S.C. § 282: "A patent shall be presumed valid." If this were not so every time a patent was declared invalid every action which had been taken in reliance upon it would be subject to damage suits. This in turn would make it too hazardous to ever seek a patent.

10. The language used by the plaintiff in several of its license agreements provided:

"Licensee agrees that it will not contest the vaidity of any patent which is now a part of this agreement during the life of this agreement and thereafter."

11. The Court stated: "We are satisfied that Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc., . . . itself the product of a clouded history, should no longer be regarded as sound law with respect to its 'estoppel' holding, and that holding is now overruled." Id. at 671, 89 S.Ct. at 1911.

12. In an earlier opinion, the same district judge held that Lear was not to be retroactively applied. Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 306 F. Supp. 189, 201 (E.D.Wis.1969). We reversed on other grounds, finding that a fraud had been committed on the patent office, that Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247, applied and that the conduct there involved was "predatory." 452 F.2d 579, 599 (7th Cir. 1971).

be applied nonretroactively [13] as a matter of *stare decisis:*

"In our cases. dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed, . . . Second, it has been stressed that 'we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' . . . Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.' "

In *Lear*, there was an express overruling of a past precedent. Although the Court noted that "[l]ong before *Hazeltine* was decided, the estoppel doctrine had been so eroded that it could no longer be considered the 'general rule' " (395 U.S. at 664, 89 S.Ct. at 1908), nevertheless in *Hazeltine* the Court characterized it as the general rule.[14] Whether *Hazeltine* was "clear past precedent" to the Supreme Court in 1971, the unqualified pronouncement in that case undoubtedly made the doctrine clear enough to parties relying upon it from 1950 to 1971.

The prior history of the estoppel doctrine, its purpose and effect, and its merits and demerits were thoroughly canvassed in *Lear*. The Court began its analysis with a statement of the competing policies:

"The uncertain status of licensee estoppel in the case law is a product of judicial efforts to accommodate the competing demands of the common law of contracts and the federal law of patents. On the one hand, the law of contracts forbids a purchaser to repudiate his promises simply because he later becomes dissatisfied with the bargain he has made. On the other hand, federal law requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent. Sears, Roebuck v. Stiffel Co., *supra* [376 U.S. 225 [84 S.Ct. 784, 11 L.Ed.2d 661] (1964)]; Compco Corp. v. Day-Brite Lighting, Inc., *supra* [376 U.S. 234 [84 S.Ct. 779, 11 L.Ed.2d 669] (1964)]. When faced with this basic conflict in policy, both this Court and courts throughout the land have naturally sought to develop an intermediate position which somehow would remain responsive to the radically different concerns of the two different worlds of contract and patent. The result has been a failure. Rather than creative compromise, there has been a chaos of conflicting case law, proceeding on inconsistent premises. Before renewing the search for an acceptable middle ground, we must reconsider on their own merits the arguments which may properly be advanced on both sides of the estoppel question." 395 U.S. at 668, 89 S.Ct. at 1910.

The Court concluded its survey of the estoppel doctrine by determining:

"Surely the equities of the licensor do not weigh very heavily when they

---

13. The Court quoted the basic notion from Griffin v. Illinois, 351 U.S. 12, 26, 76 S.Ct. 585, 594, 100 L.Ed. 891 (Frankfurter, J., concurring in judgment) that "[w]e should not indulge in the fiction that the law now announced has always been the law . . . ." *Id.* at 107, 92 S.Ct. at 356.

14. The Supreme Court of California in *Lear* had described the estoppel doctrine as "one of the oldest doctrines in the field of patent law." 67 Cal.2d 882, 891, 435 P.2d 321, 325 (1967).

are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued." *Id*. at 670, 89 S.Ct. at 1911.

█ The key policy motivation weighing the scales in *Lear* in favor of outlawing licensee estoppel was obviously the "unmuzzling" of licensees to challenge patentability. Clearly, that unmuzzling occurred instanter the day *Lear* was decided. Consequently, it operates retrospectively in the sense that it affected the executory portion of license restrictions regardless of when they were negotiated and entered into by the parties. As of June 16, 1969, such restrictions became null and void and unenforceable. Massillon-Cleveland-Akron

Sign Co. v. Golden State Advertising Co., 444 F.2d 425, 427 (9th Cir. 1971); Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc., 468 F.2d 225, at 231 (7th Cir. 1972).

On the other hand, it is difficult to see how the awarding of damages (assuming they would be provable as proximately caused by a restriction) would effectuate any unmuzzling, particularly in this case where the defendants are not licensees and were never subjected to the restrictions.

In an analogous situation, the Sixth Circuit has held that a license restriction voidable under *Lear* is not void *ab initio*, entitling the licensee to recoup royalties already paid. Troxel Manufacturing Co. v. Schwinn Bicycle Co., 465 F.2d 1253 (6th Cir. August 11, 1972).[15]

To award damages occurring prior to the decision of *Lear*, based upon the license restrictions voided on that date, would not enforce *Lear's* policy but would be purely punitive, a result not warranted where, as here, no fraud nor bad faith was shown to be involved. This brings us to the third factor determining retroactivity: it would lead to inequitable results to apply *Lear* retroactively insofar as damages are concerned in the present case.[16] We con-

15. Although such a holding may seem to fly in the face of the Supreme Court language that "Lear must be permitted to avoid payment of all royalties accruing after Adkins' 1960 patent issued" (395 U.S. at 674, 89 S.Ct. at 1913), the Sixth Circuit points out that Lear had terminated all license payments prior to the issuance of the patent and that no royalties were paid after the patent issued. 465 F.2d 1253, page 1259. Thus, there was no question of recouping royalties previously paid.

16. For example, in United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), the Court held that a patentee did not violate the antitrust laws by appointing *del credere agents* who sold patentee's products on consignment at a price fixed by the patentee. In Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), the Court held that resale price

maintenance through coercive "consignment" agreements violated the antitrust laws. Although the Court sought to distinguish *General Electric* on the ground that the product involved there was patented, Mr. Justice Stewart, dissenting, concluded that "[i]t is clear, therefore, that the Court today overrules General Electric." *Id*. at 29, 84 S.Ct. at 1061. Justices Brennan and Goldberg were concerned with "agreements that may have been entered into in reliance upon United States v. General Electric." *Id*. at 31, 84 S.Ct. at 1059. Obviously with these considerations in mind, the majority opinion by Mr. Justice Douglas decided that "[w]e reserve the question whether, when all the facts are known, there may be any equities that would warrant only prospective application in damage suits of the rule governing price fixing by the 'consignment' device which we announce today." *Id*. at 24–25, 84

clude, therefore, that *Lear* should not be applied retroactively to this case in its damage aspects.

■ Consequently, the portion of plaintiff's license agreements providing that the licensee "will not contest the validity of any patent which is now a part of this agreement during the life of this agreement" did not constitute a misuse of the patent. The clause became null and void on June 16, 1969, and the patents on which it was based became invalid shortly thereafter as a result of this Court's final decision in that regard. 421 F.2d 809, cert. denied, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1971). At that point the policy of *Lear* had been vindicated.

■ However the problem here is complicated by the fact that some of the plaintiff's license agreements purport to extend the no-contest provisions beyond the life of the agreements and some of its sales agreements purport to extend the acknowledgment of patent validity beyond the life of the agreements.[17] In Brulotte v. Thys Co., 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964), the Court found a *per se* misuse of patent where royalty payments under license agreements projected beyond the expiration date of the last covered patent.[18] The misuse was based on activities (exaction of royalties) occurring in the post-expiration period.

Here the licensees were purportedly agreeing not to contest the validity of plaintiff's patents after the termination of the license agreement.[19] There is no evidence in the record that any licensee terminated his license arrangement with the plaintiff and hence no post-expiration activities actually took place.

However, some misuse may be inferred from the mere presence of the "thereafter" clause. Licensees and purchasers may have been induced to continue their licensing or purchasing arrangements with the plaintiff because if they terminated those arrangements to seek to deal with a competitor such as defendant, they would, prior to *Lear*, have been unable to defend against an infringement suit by the plaintiff. Nevertheless, in order to succeed in their counterclaim the defendants must show all of the ele-

S.Ct. at 1058. On remand, the district court found that the new rule would be unfair to the litigant in that case, precluding damages. The Supreme Court reversed, holding that the reserved question did not apply to the litigants in that case but to the prospective application of the new rule in other cases. Simpson v. Union Oil Co., 396 U.S. 13, 14, 90 S.Ct. 30, 24 L.Ed.2d 13 (1969).

17. Defendants seek support for the judgment in their favor in the fact that some of plaintiff's license agreements including the restrictive language were purchase licenses and others were manufacturing licenses, but they cite no authority which would lend significance to the distinction. Plaintiff on the other hand relies on Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., 169 F. Supp. 1, 26 (E.D.Pa.1958), aff'd., 268 F.2d 395 (3rd Cir.), cert. denied, 361 U.S. 894, 80 S.Ct. 190, 4 L.Ed.2d 151 (1959), where similar licenses were involved and the court said: "The purchase requirement pertained to patented gages only. . . . It is to be noted that the licenses do not prevent the licensees from buying gages of any kind, in any quantities, and from whomsoever the licensees pleased, so long as the gages do not infringe Baldwin's patents. In effect, the agreements are undertakings not to infringe the Baldwin patents."

18. The Court distinguished (and presumably was then still acknowledging favorably) Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, by pointing out that there "[w]hile some of the patents under that license apparently expired, the royalties claimed were not for a period when all of them had expired." 379 U.S. at 33, 85 S.Ct. at 179.

19. Although each license agreement would expire by its terms with the expiration of the covered patents "and improvements thereon, and under any divisions, continuations, reissues or extensions thereof" nevertheless the terms of the various license agreements could expire while the patents remained in effect since the licensor could terminate for breach and the licensee could terminate without cause, each upon giving 60 days' written notice.

ments necessary to create an antitrust cause of action, including damages suffered by the defendants as a proximate result of illegal acts of the plaintiff.

### V

Much of defendants' evidence intended to show antitrust damages is based upon the alleged failure of the business of Balax to progress in an economically satisfactory manner due to the financial pressures of maintaining its defense to this lawsuit. Even as such damages, if proved, are not recoverable from a patent law standpoint inasmuch as a suit to prevent infringement is not a patent misuse (35 U.S.C. § 271(d)),[20] neither are the same damages recoverable from an antitrust standpoint unless the suit is an integral part of a conspiracy to restrain trade or to monopolize[21] over and beyond the protection afforded by the presumptively-valid patent rights.[22] Our examination of the record discloses no action by the plaintiff relating to the institution of this lawsuit which differs in any material respect from that of any patentee who has assumed that his patent is valid.

The defendants' original counterclaim, filed on June 30, 1964, did not allege much more than that "Defendants have continually been harassed by Plaintiff and have been the victims of illegal conspiracies in restraint of trade and of interference with contract." An amended counterclaim was filed on February 14, 1966, stating, among other allegations, that the plaintiff and its licensees had agreed to handle plaintiff's taps only and that one of plaintiff's officers "regularly meets with representatives of 'competitive' tap manufacturers in a Metal Cutting Tool Institute and at Tap Standards meetings."

After hearing the evidence in the original trial (at which most of the evidence in the record now before us was adduced), the trial judge found (291 F.Supp. 328, 348):

"In my opinion, this counterclaim may not succeed because (1) there was no adequate proof of fraud in procuring the patents in suit, (2) the plaintiffs are not properly chargeable with illegal enforcement of their patents, and (3) there has been no sufficient showing of an illegal combination to restrain trade."

Upon remand there was a two-day trial at which proof was limited to that which was not available at the time of the previous trial. The trial judge's findings at the conclusion of the remand trial included a finding that the plaintiff "improperly influenced the pricing structure of swaging taps and exerted an excessive influence on the price thereof" (Finding of Fact 17) and that the "sales to consumers by distributors for Besly and its licensees were at . . . identical list prices. . . ." (Finding of Fact 19). The evidence shows that swaging taps are sold at approximately the same price.[23] We have searched the record in vain in an effort to find any

20. See footnote 8. In the prior appeal, this Court concluded that "we do not find adequate grounds for making an award of attorneys' fees to defendants." 421 F.2d 809, 821.

21. Dairy Foods, Inc. v. Dairy Maid Products Cooperative, 297 F.2d 805, 809 (7th Cir. 1961); Clapper v. Original Tractor Cab Co., 270 F.2d 616, 623–624 (7th Cir. 1959), cert. denied, 361 U.S. 967, 80 S.Ct. 588, 4 L.Ed.2d 547 (1960). In both the *Clapper* and *Dairy Foods* cases, two or more patentees were alleged to have conspired to pool their patents. See Hartford-Empire Co. v. United States, 323 U.S. 386, 165 S.Ct. 373, 89 L.Ed. 322 (1945). The nexus between patent misuse and possible antitrust violations is a close and obvious one in patent pool situations.

22. Laitram Corp. v. Deepsouth Packing Co., 279 F.Supp. 883, 891 (E.D.La. 1968): "'Where * * * the infringement suit and notices sent to the trade at the commencement of such suit are the sole cause of damage suffered by the claimant' we are told by a writer who is backed by ample authority, 'the courts have uniformly refused recovery of treble damages' [Note, 52 Col.L.Rev. 936, 937 (1952)]."

23. The evidence consisted of (1) the statement of the General Sales Manager of

other evidence tending to support the trial judge's finding, not of price-fixing, but of improper price influencing.[24]

■■■ Although "[n]o formal agreement is necessary to constitute an unlawful conspiracy," American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946), similarity in the sale of standardized products does not alone make out a case of collusive price fixing, the reason being that competition will ordinarily cause one producer to charge about the same price charged by any other.[25] United States v. International Harvester Co., 274 U.S. 693, 708–709, 47 S.Ct. 748, 71 L.Ed. 1302 (1927); Cement Mfrs. Protective Ass'n v. United States, 268 U.S. 588, 605–606, 45 S.Ct. 586, 69 L.Ed. 1104 (1925). The Supreme Court "has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense." Theatre Enterprises, Inc. v. Paramount Film Dist. Corp., 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). We conclude that there was no evidence to support a conspiracy to fix or influence prices.

■■■ As in Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 452 F.2d 579, 600 (7th Cir. 1971), cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972), the defendants have argued here that "plaintiff's dominant position, coupled with its restrictive licensing practices, has enabled it to enhance the price level."[26] Our response to this argument continues as there: "If this be so, defendant, as a competing manufacturer of machines, would not have been injured."

## VI

There being no evidence to support any *per se* antitrust violations,[27] we proceed to consider whether the totality of evidence, although not constituting patent misuse nor *per se* antitrust violations, did constitute an attempt by plaintiff to monopolize interstate commerce, which caused damage to the defendants.

■■■ The heart of the trial court's legal conclusion after remand was that:

"The acts of Besly and Besly's agreements with purchasers of its swaging taps and with its patent licensees violated the Sherman Act because they constituted an attempt by Besly to monopolize trade or commerce between the states of the United States in said swaging tap market." (Conclusion of Law No. 3.)

---

Balax who testified that prices were identical "so far as I know" (A. 535–536); (2) the statement of plaintiff's General Manager that prices were "pretty comparable" (A. 568); and (3) documentary evidence that two of plaintiff's licensees had identical prices and discounts on one tap size (Tables 3 and 6, Add. A.).

24. Defendants in their brief point out that plaintiff and all but two of its licensees (and, as supplemented by plaintiff's reply brief, three of the Balax licensees) are members of the Metal Cutting Tool Institute. In Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, at 584, 45 S.Ct. 578, at 585, 69 L.Ed. 1093 (1925), the Supreme Court said: "We do not conceive that the members of trade associations become . . . conspirators merely because they gather and disseminate information . . . bear-

ing on the business in which they are engaged and make use of it in the management and control of their individual businesses. . . . "

25. In this case the distributor prices of Balax were approximately the same as plaintiff's prices to distributors (A. 673).

26. Although the prices of swaging taps to distributors were unaffected by a price war in the cutting tap market, nevertheless the price war had caused a 20–25% decrease in plaintiff's sales of swaging taps (A. 564–65).

27. We recognize that the trial court found that plaintiff "unlawfully foreclose[d] competitors" (F.F. 18) and that this could rise to a *per se* violation (United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948)) but we consider this argument *infra* as part of our consideration of monopoly power.

Section 2 of the Sherman Act proscribes attempts to monopolize. In the words of Judge Learned Hand, "In order to fall within § 2, the monopolist must have both the power to monopolize, and the intent to monopolize." United States v. Aluminum Co. of America, 148 F.2d 416, 432 (2nd Cir. 1945). See also, Bernard Food Industries, Inc. v. Dietene Co., 415 F.2d 1279, 1284 (7th Cir. 1969), cert. denied, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970).

The trial court defined the relevant product market to be "the sale for resale of swaging taps." This market definition ignored the evidence in the record of interchangeability among swaging taps and cutting taps.

In United States v. Du Pont & Co., 351 U.S. 377, 394–395, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956), the Court said:

"When a product is controlled by one interest, without substitutes available in the market, there is monopoly power. Because most products have possible substitutes, we cannot . . . give 'that infinite range' to the definition of substitutes. Nor is it a proper interpretation of the Sherman Act to require that products be fungible to be considered in the relevant market.

.    .    .    .    .    .

". . . In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably in-terchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal."

In addition to a considerable amount of testimony by both sides as to the physical interchangeability and competitive interchangeability of swaging taps and cutting taps [28] it is entirely clear from the defendants' own admissions that swaging taps are "reasonably interchangeable" with approximately 50% of the cutting tap market.[29]

Using both of defendants' hypotheses, namely that 50% of the $60 million per year tap market is potentially interchangeable between cutting and swaging taps and that after an actual interchange the $30 million market would decrease to $6 million by virtue of the relative inexpensiveness of the total volume of needed swaging taps, the comparative market position of plaintiff (Besly), defendant Balax and plaintiff's licensees were as follows:

*Percentage of $30 Million Tap Market*

|  | 1968 | 1970 |
|---|---|---|
| Besly | 3.2% | 2.7% |
| Balax | 1.4 | 2.2 |
| Besly Licensees | 2.4 | 3.6 |

*Percentage of $6 Million Tap Market*

|  | 1968 | 1970 |
|---|---|---|
| Balax | 15.8% | 13.4% |
| Balax | 7.2 | 10.8 |
| Besly Licensees | 12.2 | 17.8 |

Accepting all alternatives in favor of the defendants (that is, the $6

---

28. A. 533–35, 538–39, 579–82.

29. In defendants' brief, p. 43, they state:
    "The advent of swaging taps seriously threatened the cutting tap manufacturers for two reasons. First, swaging taps have no flutes so that fluted blanks are not needed, and small competitors can readily enter the market with a single thread grinding machine (A–465, 513). Second, each swaging tap replaces on the average at least 10 cutting taps (A–483). Hence although the swaging tap costs twice as much as a cutting tap, swaging taps will replace cutting taps for a consumer at one-fifth the investment. *The parties agree swaging taps can supersede approxi-mately 50% of the cutting taps now in use (A–483, 534, 566). In other words, of approximately $60,000,000 in cutting taps sold, $30,000,000 will be lost to swaging taps (A–566).* However, when swaging taps supersede the $30,000,000 worth of cutting taps, those swaging taps will sell for only $6,000,000 because as noted each swaging tap, although costing twice as much as a cutting tap, will replace 10 cutting taps (A–483).
    "Thus the intrusion of swaging taps into the cutting tap market results in very substantial losses to the established cutting tap manufacturers . . . ." (emphasis added).

million market and combining the plaintiff's share of the market with the share of its licensees) the combined market position of plaintiff and its licensees is 31.2%. In the oft-cited words of United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2nd Cir. 1945), 33% control of a market "is not enough" to constitute a monopoly.[30]

In Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 452 F.2d 579, 598 (7th Cir. 1971), cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972), we held that a patentee who controlled one-third of the relevant market posed a "dangerous probability" of monopolizing that market. Although Judge Stevens stated in that case that the dangerous probability test did not "involve an evaluation of the actual likelihood that an attempt would have succeeded if not frustrated by an intervening event," it is noteworthy, if not distinguishing, that there the intervening event was exposure of a fraud on the patent office and engaging by the patentee in predatory conduct, whereas here the issuance of the patents was procured in good faith by the plaintiff and the intervening agent was this Court's holding that the patents were invalid. Once petition for certiorari was denied, all of plaintiff's agreements based on the invalidated patents were cancelled (A. 565), thus terminating plaintiff's ability to consummate any monopoly.

■ All of those facts and pertinent precedents, however, simply emphasize that in this case the question of potential monopoly power is exceedingly delicately balanced on several fine lines and we should not purport to rely upon its existence or non-existence if in fact the defendants have not met their burden of demonstrating that plaintiff's conduct "injured [them] in . . . [their] business or property." 15 U.S.C. § 15.

Defendant Balax claimed and the district court found that plaintiff's activities enabled it to "unlawfully foreclose competitors, among others Balax, from a substantial market, i. e., the sale for resale of swaging taps" (F.F. 18).

Balax not only had obtained a patent on an improved type of swaging tap, but marketed that tap as a superior product.[31]

The dollar volume of Balax swaging tap sales (rounded to the closest thousand dollars) were:

| 1964 | $108,000 | |
| 1965 | 156,000 | |
| 1966 | 267,000 | |
| 1967 | 332,000 | |
| 1968 | 430,000 | |
| 1969 | 484,000 | |
| 1970 | 647,000 | (projected) |

30. On the other hand, 33.2% "is impressive," United States v. Columbia Steel Co., 334 U.S. 495, 533, 68 S.Ct. 1170, 92 L.Ed. 1533 (1948), although in that case not determinative.

31. Van Vleet testified in answer to the question as to why Balax went into the swaging tap market (A. 513): "For a number of reasons. One, we were unable to purchase on the outside—from an outside vendor blanks of suitable quality. We ·tried with three manufacturers to purchase blanks and were not successful. Second, we realized how much we— realized as the result of tests how inferior the *current swaging taps were to* the kind that we could build. The tests that we have run and tests that our customers had run in the field indicated a marked superiority in our product. ·Thirdly, we could go into the swaging tap business without the purchase—without the capital investment of expensive fluting equipment and make a profit. We, therefore, elected to work on that area and to meanwhile design our own fluting equipment for the cutting taps so that we would be self-sufficient and do all of our operations within our own four walls."

Van Vleet also testified (A. 467): "Our methods at Balax are *so very different,* our procedures, our operations, our machinery, is so very different that if we tried to use Besly-Welles methods, we could not operate our shop. We could not make a profit."

The district court found after. the first trial that "when the plaintiffs visited the Balax plant in 1965, they found very little in common between the two operations." 291 F.Supp. at 345.

Comparative sales of swaging taps in terms of percentages were:

|                  | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 |
|------------------|------|------|------|------|------|------|------|
| Besly            | 58%  | 50%  | 52%  | 45%  | 45%  | 50%  | 32%  |
| Balax            | 8    | 10   | 15   | 17   | 20   | 23   | 26   |
| Besley Licensees | 33   | 39   | 33   | 38   | 35   | 27   | 42   |

Balax's sales had increased at a steady, substantial rate prior to the cancellation of Besly's licenses on June 22, 1970; its share of the swaging tap market increased at the same time in an impressive fashion and at the expense of Besly's share of that market (the plaintiff's licensees' share also increasing but not as sharply as that of Balax).

In the ordinary situation of proving damages allegedly caused as the result of certain actions by another, the injured person or corporation shows how its sales *declined* during the pertinent period but even that is not deemed sufficiently probative. In Continental Nut Co. v. Robert L. Berner Co., 393 F.2d 283, 286 (7th Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968), this Court said that "where . . . the plaintiff knows the identity of the customers it claims to have lost and has a record of the previous purchases of each, special damages in the form of profits lost because of the withdrawal of patronage by such customers, to be recoverable, must be proved with that specificity which shows the loss of profit attributable to patronage withheld by the particular customer and that such withholding was the result of . . . [the other party's unlawful act]."

Here, where Balax's sales increased very substantially, the evidence of damages consists of (1) Van Vleet's testimony that he "thinks" that "one of the reasons" for Balax's Detroit representative discontinuing representing Balax was because a Ford Motor Company plant to which he hoped to sell taps had learned of the infringement suit (A. 508–10); (2) Van Vleet's testimony that "I believe our business amounted to something like 60 per cent of what it would have amounted to had this action not been brought" (A. 511) and (3) Balax's sales manager's testimony that but for the lawsuit sales would be "I would say at least twice as much as we are currently [selling]" (A. 536–537).[32]

We have already discussed the fact that the institution of the law suit in itself was not an actionable wrong here and that defendants failed to prove that such institution was an integral part of a conspiracy. It is further obvious that the defendants have not proved any specific damages nor shown beyond mere speculation that if any damages were sustained, they were the result of any antitrust violations.

The same manufacturers, including plaintiff, who supply the swaging tap market also supply the cutting tap mar-

---

**32.** This is a far cry from defendants' relied-upon quotation from Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 323, 91 S.Ct. 795, 798, 28 L. Ed.2d 77 (1971) that "Zenith demonstrated the fact and extent of its business injury by estimating the percentage of the foreign market it would have enjoyed absent the conspiracy during the four years prior to 1963 and showing the portion it actually enjoyed during those years." As demonstrated by the Supreme Court's earlier opinion in the same case, the "estimate" was based on carefully calculated and precise facts. See 395 U.S. 100, 116, n. 11, 89 S.Ct. 1562, 1573, 23 L.Ed.2d 129: "The computation of damages, prepared by Zenith's experts and accepted by the District Court, see 239 F.Supp. at 76, reflects a comparison between Zenith's percentage share of the United States television market, ranging from 15.6% in 1959 to 21.7% in 1963, and Zenith's actual share of the Canadian market during the same period, ranging from 3.1% in 1959 to 5.2% in 1961 and down to 3.2% in 1963."

ket, except Balax which supplies only the swaging tap market. There is no evidence in the record that plaintiff has played any part in excluding the defendants from the cutting tap market. Yet the crucial testimony regarding what Balax conceives to be its damages included the following (A. 536, 537):

"Q. Has Balax expanded its market geographically as far as you feel it can?

"A. No, definitely not.

"Q. What should Balax do in order to expand the market further geographically?

"A. We need a more complete line for one thing, and we need representation in probably three additional areas in the country where we are not represented now and where there is a substantial volume of tap business.

\* \* \* \* \* \*

"Q. How would you expand your line so as to be able to expand your market geographically?

"A. The product which would be most closely related to our line and, therefore, would lend itself to selling to our current dealer and distributor organization would be a line of cutting taps."

In other words, Balax's business has steadily increased and would increase more if it carried cutting taps, which it does not, through no reason proved to be attributable to the plaintiff.

Although defendants concede that "the intrusion of swaging taps into the cutting tap market results in very substantial losses to the established cutting tap manufacturers,"[33] defendants would hypothesize without supporting evidence that the cutting tap manufacturers would conspire with the plaintiff (1) to

keep the price of swaging taps high although those of cutting taps were dropping during a price war and (2) to restrict themselves through license agreements, all to the benefit of plaintiff but to their own great detriment. We have previously considered the pricing aspects and we now add as we did in the *Kearney & Trecker* case, supra, that "defendant never took a license . . . and to the extent that those provisions made plaintiff's licensees less effective competitors, defendant certainly was not harmed." 452 F.2d at 600, n. 52. There is no evidence that the defendants were foreclosed from any market or, if they were, that they were injured.

We conclude that there was no *per se* patent misuse and were no *per se* antitrust violations, which enable us to consider the reasonableness of plaintiff's actions and to require that defendants prove damages with specificity and also to prove that such damages, if any, were caused by plaintiff's actions. In accordance with our preceding analysis, we conclude that plaintiff's actions in protecting what it presumed to be a valid patent were reasonably designed to effectuate that protection, that defendants did not prove any recoverable damages, and that assuming or speculating that damages were incurred by defendants, they failed to prove that such damages were the proximate result of plaintiff's actions.[34]

Therefore we reverse the district court's judgment.

HASTINGS, Senior Circuit Judge (concurring in the result).

In our decision of the first interlocutory appeal in this case, Bendix Corporation v. Balax, Inc., 7 Cir., 421 F.2d 809 (1970), cert. denied, 399 U.S. 911, 90 S.Ct. 223, 26 L.Ed.2d 562, we made a final disposition of all issues therein

---

33. See footnote 29.

34. In this opinion we have commented upon certain of the evidence. The fact that we have not commented upon all of the some 600 exhibits nor upon all of the some 1500 pages of testimony nor upon the many depositions, is not intended to give any indication that we have not considered all of it in reaching our conclusion.

raised, except the one question remaining on the remand. We noted that the trial court had rather summarily brushed aside the charge of antitrust violations by dismissing defendants' antitrust counterclaim against plaintiffs. Further, we observed that the parties did not address themselves to the *relevance, if any,* of Lear, Inc. v. Adkins, 395 U.S. 653, 668–671, 89 S.Ct. 1902, 23 L.Ed.2d 610 (June 16, 1969), to this issue in the prior appeal, and that it could not have been considered by the district court because *Lear* was subsequent to its prior judgment. Under those circumstances "we [felt] it should be *first* presented to the trial court for its consideration." (Emphasis added.) We purposely withheld our views on the "relevance, if any," of *Lear* and did not intend to indicate how the district court should resolve this matter. 421 F.2d at 820–821.

On remand, after further hearing, the district court obviously thought *Lear* was relevant and found Bendix and Sellew liable for damages to Balax and Van Vleet for its Sherman Act violations. In all other respects, the counterclaim was dismissed.

I find myself in agreement with that part of Part IV of the majority opinion which contains the conclusion "that *Lear* should not be applied retroactively to this case in its damage aspects." If *Lear* is not to be applied retroactively, and I agree that it should not be, then, in my judgment, that effectively disposes of the present appeal. Under the express terms of our prior remand "the relevance, if any, of *Lear*" has been determined—it has none. That settles the issue before us and the original dismissal of the counterclaim should be reinstated.

I, therefore, join in that part of the majority opinion holding that *Lear* should not be applied retroactively and on this ground alone concur in the judgment of reversal.